UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, O'Brien and Raphael


MICKEY WILSON

MEMORANDUM OPINION* BY
v.         Record No. 0986-21-3          JUDGE MARY GRACE O'BRIEN
                                         MAY 10, 2022
RUSSELL COUNTY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF RUSSELL COUNTY
Michael Lee Moore, Judge

(David R. Tiller; Tiller & Tiller, P.C., on brief), for appellant.
Appellant submitting on brief.

(M. Katherine Patton; F. Bradley Pyott, Guardian *ad litem* for the
minor child; Gillespie, Hart, Altizer & Whitesell, P.C., on brief), for
appellee.  Appellee and Guardian *ad litem* submitting on brief.[1]


Mickey Wilson ("father") appeals a circuit court order terminating his parental rights under

Code § 16.1-283(C)(2) and approving a foster care goal of adoption.  He argues the court lacked

subject matter jurisdiction to enter the termination order and, alternatively, erred by finding

sufficient evidence to terminate his parental rights.

BACKGROUND

J.W.,[2] born April 12, 2019, is the child of father and Alyssa Franks ("mother").  In May

2019, the Russell County Department of Social Services obtained a protective order for J.W.

because mother was undergoing inpatient mental health treatment and father could not provide a

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Pursuant to Rule 5A:19(d), the guardian *ad litem* filed a notice joining with appellee and
relying on its brief.

[2] To protect the child's privacy, we use initials rather than the name.

suitable home. At first, father and J.W. lived with father's mother in a home DSS described as "extremely cluttered as if 'hoarders' lived there." J.W. then resided with a paternal uncle; however, the uncle did not want to become a DSS-approved foster care provider, and father no longer wanted J.W. to live with relatives.

On June 17, 2019, the juvenile and domestic relations district court ("JDR court") ruled that J.W. was abused or neglected. The JDR court transferred custody to DSS because "[c]ontinued placement in the home would be contrary to the welfare of the child" and "[r]easonable efforts ha[d] been made . . . to prevent removal of the child from the home." The order noted that these findings were "[b]y agreement of all parties" and granted father supervised visitation.

In August 2019, when she was approximately four months old, J.W. was placed in the foster home where she remains today.

DSS provided services to both parents, including parenting classes and mentoring, mental health services, and visitation assistance. Father rented an apartment and started preparing for J.W.'s return. A DSS social worker visited the home and found that, although father was "making progress with services," the apartment's condition had deteriorated, he had never set up a crib, and his cluttered vehicle could not accommodate a car seat.

In March 2020, father moved into a mobile home with mother, who had been released from the mental health facility. Father testified that they moved to have more room and privacy, and he believed the mobile home was safer for J.W.

A social worker visited the mobile home and identified multiple safety hazards that "pose[d] a risk of harm to the child." Repairs were needed for the siding, ceilings, and exposed electrical and plumbing components. An extension cord was running through a broken window in the bedroom the parents had designated for J.W.

When the social worker returned in August 2020, the necessary repairs had not all been made, and the "same pattern of extensive clutter" from the prior living situations had expanded into the "home, yard, and carport." The social worker spoke to father about cleaning up the premises and installing child safety devices.

The social worker and her supervisor returned in October 2020, again finding the mobile home, yard, and carport cluttered. None of the child safety devices had been installed in the residence. Although father had made some initial repairs, the residence still contained "multiple safety hazards for the child," including weak flooring, exposed nails, and the broken window in J.W.'s designated room. Father advised the supervisor that he did not intend to fix the window. Father had also purchased an old motor home that was parked in the yard and in disrepair.

Another social worker visited in July 2021. Father did not let her inside, so she returned a week later. Although father had made some repairs to the home, the social worker still observed several safety hazards. There were holes in the wall, and the extension cord was still running through the broken window in J.W.'s room. She observed a gun on the couch and a crossbow and knife in the yard. The carport had "[c]ords, wiring, tools, and nuts and bolts . . . scattered everywhere," and a "disassembled engine [was] scattered all over."

At trial, father explained that he could have cleaned his car and residence "in five minutes" if J.W. was coming home. He described the mobile home as a "fixer-upper," and although he acknowledged that it needed "multiple repairs to be suitable and safe" for a child, he "felt like he was making progress in getting things fixed to [DSS's] satisfaction." Father also admitted hiding in the woods when the child's guardian *ad litem* visited in October 2020; the guardian knocked on the door and took pictures of the property, and father threatened to bring criminal charges for trespass. Father testified that he did not let the social worker into his home in July 2021 because he "had a female companion inside the home and they had been drinking moonshine."

Father maintained consistent visitation with J.W. Beginning in March 2020, and for approximately another four months, visitation was virtual due to the COVID-19 pandemic. However, all visits were in person in the eight months before March 2020 and in the four months leading up to the termination of parental rights. By agreement of all parties, J.W.'s foster mother attended the visitations to help J.W. adjust. The foster mother brought a diaper bag and necessities, sometimes fed the child, and testified that the parents never offered to help. Father testified that the "virtual visits did not work well because of [J.W.'s] age and attention," and the in-person visits were not long or frequent enough to facilitate parent-child bonding. Father also stated that he was "less interactive with [J.W.]" during visitation because he wanted to give mother the chance to make up for lost time; he also thought the foster mother's presence interfered.

The JDR court approved interim foster care service plans in August 2019 and in October, March, and August 2020. Initially, the goal was for J.W. to return home. At the August 2020 hearing, the court advised the parents "to have everything completed and in order by next court date or the goal would have to be changed." A hearing was set for December 7, 2020.

On November 2, 2020, DSS petitioned for a permanency planning hearing and identified a new permanent goal of "relative placement/adoption." DSS specifically stated that it was not seeking termination of parental rights at that time because "the filing of such a petition is not in the best interest of the child."

DSS filed an updated foster care service plan on November 9, 2020, reflecting concurrent goals of relative placement and adoption. In its filing, DSS emphasized that it had not found a suitable relative placement for J.W. and the foster parents were interested in adopting the child. The December 7, 2020 hearing was continued to January 14, 2021.

On January 14, the JDR court "reviewed the foster care plan with the permanent goal of adoption" and entered a permanency planning order finding that "[t]ermination of parental rights

[was] documented as being in the best interest of the child." The JDR court ordered DSS to "file petitions to terminate parental rights pursuant to [Code] § 16.1-277.01 or 16.1-283." Code § 16.1-277.01(D) authorizes a court to terminate parental rights based on a "petition seek[ing] approval of a permanent entrustment agreement which provides for the termination of all parental rights," and Code § 16.1-283 authorizes the involuntary termination of parental rights.

On January 21, 2021, DSS filed a petition requesting that the JDR court "approve an entrustment agreement for permanent surrender of the child." DSS did not file a petition for involuntary termination of parental rights pursuant to Code § 16.1-283.

The JDR court conducted a hearing on March 1, 2021. An order from that day states that "the petition for termination of the father's residual parental rights is granted." Accordingly, the JDR court terminated father's parental rights under Code § 16.1-283(C)(2) and authorized adoption. The court also terminated mother's parental rights, and she did not appeal.

Father appealed to the circuit court, which held a *de novo* trial on July 26, 2021. The final order states that the parties "appeared . . . on the petition for termination of residual parental rights . . . and the petition for approval of the permanency plan entered [sic] by the [JDR court] on March 1, 2021."

The final order also reflects the court's factual findings from the trial, including that J.W. entered DSS custody in June 2019 when mother was involuntarily hospitalized due to mental instability and "with the consent and agreement of [father] given the unsuitable living conditions of his mother's home where he had been residing with the child."

The court found that DSS provided services and visitation, including parenting classes and psychological evaluations, in which father participated. Having reviewed video from the visitation, the court found a "lack of bond between the child and the parents" and a "lack of actual participation by the father with the child during visitation." Additionally, the photographs from

father's three residences during the pendency of the case (the paternal grandmother's home, father's apartment, and the mobile home) depicted the conditions that led to the child first coming to DSS custody and continued to serve as the basis for the child's remaining in foster care. The court acknowledged that father made some improvements requested by DSS and the guardian *ad litem*, but he "did not maintain or repair any residence to allow DSS to even allow the child to have overnight unsupervised visitation." The court ruled that father did not provide a valid reason for not obtaining and maintaining suitable housing within the twelve months of the child entering foster care. The court noted that mother did not appeal the termination of her parental rights, that DSS found no suitable or willing relatives to take J.W., and that removing the child from her current foster home—where she had lived now for two years—would be detrimental to her well-being.

Based on these findings, the court concluded that father

> without good cause, failed to or was unable to make substantial progress toward elimination of the unsafe and unsuitable living conditions which led to and required continuation of [J.W.]'s placement in foster care, and further failed to meet his obligations under and within the time limits and goals set forth in [J.W.]'s foster care service plan.

It further concluded that father had not made substantial progress "within a reasonable period of time not to exceed [twelve] months," despite the reasonable efforts of social services, and that termination of parental rights was in J.W.'s best interests. Accordingly, the court terminated father's parental rights under Code § 16.1-283(C)(2).

DISCUSSION

A.  Jurisdiction

Father argues that the circuit court[3] lacked subject matter jurisdiction to terminate his parental rights because DSS filed a petition for approval of an entrustment agreement seeking permanent surrender of the child, instead of a petition for termination of parental rights.  Father concedes that he did not present this argument at trial but contends that a lack of subject matter jurisdiction can be raised at any point during proceedings, including for the first time on appeal.

The court's exercise of jurisdiction raises a question of law that we review *de novo*.  *See Gray v. Binder*, 294 Va. 268, 275 (2017); *Riddick v. Commonwealth*, 72 Va. App. 132, 139 (2020).

Subject matter jurisdiction is "the power granted by the sovereignty creating the court to hear and determine controversies of a given character."  *Bd. of Supervisors v. Bd. of Zoning Appeals*, 271 Va. 336, 344 n.2 (2006) (quoting *Farant Inv. Corp. v. Francis*, 138 Va. 417, 427 (1924)).  The Supreme Court has explained that "subject matter jurisdiction, perhaps best understood as the 'potential' jurisdiction of a court, . . . becomes 'active' jurisdiction . . . only when various elements are present," including subject matter jurisdiction, territorial jurisdiction, notice jurisdiction, "'and the other conditions of fact [that] must exist which are demanded by the unwritten or statute law as the prerequisites of the authority of the court to proceed to judgment or decree.'"  *Ghameshlouy v. Commonwealth*, 279 Va. 379, 388-89 (2010) (quoting *Bd. of Supervisors*, 271 Va. at 343-44 & n.2).

---

[3] Although this Court reviews the decision of the circuit court, the ultimate issue is whether the JDR court had jurisdiction to terminate father's parental rights because the circuit court's jurisdiction in this matter derives wholly from the JDR court.  *See Parrish v. Fed. Nat'l Mortg. Ass'n*, 292 Va. 44, 49 (2016) ("[W]hen exercising its *de novo* appellate jurisdiction, the circuit court has no more subject matter jurisdiction than the [JDR court] had in that court's original proceeding.").

"[P]arties cannot waive the absence of subject matter jurisdiction or confer it upon a court by their consent." *Cilwa v. Commonwealth*, 298 Va. 259, 266 (2019). Any jurisdictional requirement other than subject matter jurisdiction, however, may be waived. *See Nelson v. Warden of the Keen Mountain Corr. Ctr.*, 262 Va. 276, 284-85 (2001); *see also Porter v. Commonwealth*, 276 Va. 203, 228-29 (2008).

To determine whether father's jurisdictional challenge can be raised for the first time before this Court, we must determine whether the issue presented involves the JDR court's subject matter jurisdiction or active jurisdiction.

Code § 16.1-241(A) grants JDR courts jurisdiction over matters involving the "custody, visitation, support, control or disposition of a child . . . [w]ho is alleged to be abused [or] neglected," "[w]hose custody, visitation or support is a subject of controversy or requires determination," "[w]ho is the subject of an entrustment agreement," or "[w]here the termination of residual parental rights and responsibilities is sought." Code § 16.1-241(A)(1), (3), (4), (5).

Code § 16.1-283 provides a specific procedure for the involuntary termination of parental rights.

> The residual parental rights of a parent or parents may be terminated by the court as hereinafter provided in a separate proceeding if the petition specifically requests such relief. No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to [Code] § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child. The court may hear and adjudicate a petition for termination of parental rights in the same proceeding in which the court has approved a foster care plan which documents that termination is in the best interests of the child.

Code § 16.1-283(A). The statute therefore "demand[s]" other "conditions of fact [to] exist . . . as the prerequisites of the authority of the court to proceed to judgment or decree." *Ghameshlouy*, 279 Va. at 389 (quoting *Bd. of Supervisors*, 271 Va. at 344). DSS must file a petition that "specifically

requests" termination of parental rights, after filing a foster care plan documenting that termination is in the child's best interests. Code § 16.1-283(A). This statute does not define the class of cases —*i.e.*, the subject matter jurisdiction—which the JDR court has authority to adjudicate. Instead, that class of cases is established in Code § 16.1-241(A). Therefore, the requirements of Code § 16.1-283 are not aspects of subject matter jurisdiction but, rather, constitute statutory prerequisites for a JDR court to proceed to adjudicate the termination of parental rights in a specific case. *See Bd. of Supervisors*, 271 Va. at 345; *Farant Inv. Corp.*, 138 Va. at 427-28.

The Supreme Court made a similar distinction in *Nelson*, when considering a statute providing for the transfer of a juvenile to circuit court for trial as an adult. 262 Va. at 281-85. The Court distinguished between subject matter jurisdiction granted by constitution or statute and the statutory requirements that enable a court to exercise its subject matter jurisdiction. *Id.* at 282. The Court determined that a statutory requirement of notice to parents was procedural and therefore could be waived by a failure to raise a timely objection to the lack of notice. *Id.* at 285.

Similarly, in *Boatright v. Wise County Department of Social Services*, 64 Va. App. 71 (2014), this Court differentiated between statutes containing "prohibitory or limiting language" that preclude a court from exercising its subject matter jurisdiction if the statutory requirements are not met, and statutes that are "merely directory and procedural" and allow a court to exercise its subject matter jurisdiction despite a failure to comply with the requirements. *Id.* at 80 (quoting *Marrison v. Fairfax Cnty. Dep't of Fam. Servs.*, 59 Va. App. 61, 68 (2011)). In *Boatright*, we concluded that a statute requiring a circuit court to hear a JDR appeal within ninety days was procedural, not mandatory, and therefore did "not prevent the circuit court from exercising its subject matter jurisdiction absent some showing of harm or prejudice." *Id.* at 81.

We recognize that "termination of parental rights is a grave, drastic, and irreversible action." *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986) (quoting *Lowe v.*

- 9 -

*Richmond Dep't of Pub. Welfare*, 231 Va. 277, 280 (1986)). We have often emphasized the importance of strict adherence to the statutory scheme. *See, e.g.*, *Strong v. Hampton Dep't of Soc. Servs.*, 45 Va. App. 317, 320, 322-23 (2005) (reversing where DSS failed to file a foster care plan recommending termination as required by statute, but the JDR *sua sponte* amended and "approved" a plan with a "revised goal of adoption"). However, we have never stated that the procedural requirements in Code § 16.1-283 are aspects of subject matter jurisdiction that are exempt from the contemporaneous objection requirement.

Furthermore, this is not a situation where DSS failed to invoke the JDR court's subject matter jurisdiction in the first instance. *Cf. Rader v. Montgomery Cnty. Dep't of Soc. Servs.*, 5 Va. App. 523, 526-28 (1988) (reversing an order terminating parental rights where DSS failed to "invoke the jurisdiction" of the JDR court by filing a custody petition, but where the JDR court had instead *sua sponte* transferred custody to DSS). Here, unlike in *Rader*, at the time of the hearing, the JDR court's subject matter jurisdiction had already been invoked and exercised: J.W. was previously determined to be an abused or neglected child, had been transferred to DSS custody, and had been the subject of multiple foster care plan review hearings. *See* Code § 16.1-241. A permanency planning order already found that DSS had sufficiently documented that termination of parental rights was in J.W.'s best interest. Although DSS was ordered to file a petition either for approval of a permanent entrustment agreement, or a petition to terminate parental rights, the JDR court's subject matter jurisdiction—already invoked and exercised—was not somehow suspended until DSS did so. Any challenge to the JDR court's authority to act, therefore, is a challenge to the JDR court's active jurisdiction to proceed with the termination case already open and pending.

Despite framing his appeal as a matter of subject matter jurisdiction, father actually asserts a defect in the JDR court's active jurisdiction, which means that he was required to raise the issue below to preserve it for appellate review. *See Porter*, 276 Va. at 228-29 ("In contrast [to defects in

- 10 -

subject matter jurisdiction], defects in the other jurisdictional elements generally will be considered waived unless raised in the pleadings filed with the trial court and properly preserved on appeal." (quoting *Morrison v. Bestler*, 239 Va. 166, 170 (1990))). Father did not object to the circuit court exercising jurisdiction. Although he faults the court for terminating his parental rights based on DSS's petition for an entrustment agreement for permanent surrender of the child, rather than a petition for termination of parental rights, father did not specifically object or otherwise seek correction of the final order's statement that the parties "appeared . . . for a hearing on the *petition for termination of residual parental rights of father*." (Emphasis added).

Absent the necessary contemporaneous objection below, this Court is precluded from considering father's jurisdictional challenge on appeal. *See* Rule 5A:18. Father cannot salvage this waiver by characterizing the issue as one of subject matter jurisdiction. *See Morrison*, 239 Va. at 170 (cautioning against "attempts . . . to mischaracterize serious procedural errors as defects in subject matter jurisdiction to gain an opportunity for review of matters not otherwise preserved").

## B. Sufficiency of the Evidence

Father argues that the court erred by finding sufficient evidence to warrant termination of his parental rights under Code § 16.1-283(C)(2). "On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Further, where "the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin*, 3 Va. App. at 20).

Here, the court terminated father's parental rights based on the provisions of Code § 16.1-283(C)(2). That statute requires proof by clear and convincing evidence that (1) termination

is in the best interests of the child, (2) "reasonable and appropriate" services have been offered to help the parent "remedy substantially the conditions which led to or required continuation of the child's foster care placement," and (3) despite those services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable period of time not to exceed [twelve] months from the date the child was placed in foster care." Code § 16.1-283(C)(2). *See Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 161 (2004).

The statute expressly provides that a parent's efforts to substantially remedy the conditions requiring foster care are "constrained by time." *Lecky v. Reed*, 20 Va. App. 306, 312 (1995). Absent good cause, a parent has a "reasonable period of time not to exceed [twelve] months" to make the necessary changes. Code § 16.1-283(C)(2). This provision balances the preservation of the family unit with the child's rights to permanency. *Lecky*, 20 Va. App. at 312. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990).

At the time of the termination hearing in circuit court, J.W. had been in foster care for twenty-five of her twenty-seven months. Although father complied with some services offered by DSS and regularly attended both virtual and in-person visitation, the court found that the evidence demonstrated a "lack of bond" and "lack of actual participation by the father with the child during visitation." The record supports this conclusion: father failed to interact with J.W. during visitation, and he left the child's feeding and care to her foster mother.

Significantly, father did not make substantial progress on the situation that brought J.W. into foster care—his inability to provide safe, appropriate housing. J.W. was placed in foster care because father was living with his mother in a house cluttered with debris. When he obtained an apartment, its condition quickly deteriorated and became just as cluttered. The pattern continued

when he moved to the mobile home, and the excessive clutter extended to the surrounding yard and carport. DSS social workers visited several times and identified safety hazards, itemized necessary repairs, and advised on installation of child safety devices—all to no avail. Although father made some repairs, the house remained an inappropriate residence for a small child, from the broken window with the extension cord in her bedroom to the landscape of heavy mechanical debris and discarded tool parts and appliances outside. The gun on the couch and the weaponry in the yard presented additional dangers.

Father's reluctance to cooperate with DSS and his failure to understand the gravity of the situation were also demonstrated when he threatened the guardian *ad litem* on one occasion, hid from a social worker on another, and denied a social worker access to the residence because he was inside with a female companion.

Therefore, the record supports the court's determination that DSS proved by clear and convincing evidence that termination of father's parental rights was in J.W.'s best interest and that father, without good cause, had been either unwilling or unable to remedy the conditions that led to foster care within twelve months, notwithstanding the reasonable and appropriate efforts of DSS.

## CONCLUSION

Rule 5A:18 precludes us from reviewing father's challenge to the court's exercise of jurisdiction, and the evidence was sufficient to terminate his parental rights under Code § 16.1-283(C)(2). Therefore, we affirm the judgment of the circuit court.

*Affirmed.*